539 P.2d 943

**ARIZONA BOARD OF REGENTS, a Body Corporate, John P. Schaefer, President of the University of Arizona, the Graduate Council of the University of Arizona, Herbert D. Rhodes, Dean of the Graduate College, Curtis B. Merritt, Associate Dean of the Graduate College, Robert Leslie Hull, Dean of the College of Fine Arts, Robert W. McMillan, Professor of Art and Head of Department, Appellants,**

v.

**Rubye WILSON, and husband, Appellees.**

**No. 2 CA–CIV 1828.**

Court of Appeals of Arizona,
Division 2.

Sept. 12, 1975.

Rehearing Denied Oct. 15, 1975.
Review Denied Nov. 25, 1975.

Bruce E. Babbitt, Atty. Gen. by Jack J. Rappeport and Robert O. Lesher, Sp. Asst. Attys. Gen., Tucson, for appellants.

Heather Sigworth, Tucson, for appellees.

## OPINION

HOWARD, Chief Judge.

This is an appeal from the order of the trial court requiring appellants to admit appellee as a candidate for the degree of Master of Fine Arts and Studio Painting at the University of Arizona.

The appellee, a mature woman of the age of sixty, graduated from the College of Fine Arts of the University of Arizona, having majored in studio art. In addition to her studies at the University of Arizona, appellee took undergraduate courses in the art field at Columbia University, Southern Methodist University, and Washington University (Missouri). Her application for candidacy in the Graduate College Master of Fine Arts degree program was denied by Dr. Robert W.

McMillan, head of the Art Department. The memorandum of rejection gave as a reason for denial the fact that the facilities were already committed but that she could re-apply in September of 1974 for possible admission in the second semester of the school year 1974–75. A further reason given as "Work seems already to be on professional level, but the committee feels that it does not appear to be particularly harmonious with the esthetic attitudes within the art department."

Persons who are interested in being admitted to the Graduate College are required by the Art Department to submit their applications before April 1 in order to enroll for the fall semester. These applications are to be accompanied by slides of their work for viewing by the faculty committee. The head of the Art Department has appointed a committee of five professors from his department to make the recommendations to him as to which applications should be granted. As the applications come in, they are broken down into sets of approximately eight applications. The candidates' slides are viewed by the faculty committee which votes upon whether the application should be granted. There is no "check list" or written set of standards which the faculty committee uses in judging the applicant's work. Each member of the committee uses his own standards and judgment in order to arrive at a decision as to whether there is potential in the student's work.

The Art Department does not wait until all of the applications are in before beginning its screening process, but instead considers the applications in the aforementioned group as they come in. It was explained that the reasons for doing this were that this is the system used by other colleges throughout the United States, and that if the Art Department waited until all the applications were in, it would not be able to compete with the other colleges and universities in selecting the most promising students. As it is, approximately two-thirds of the applications are denied.

Appellee's application was considered on the last day with thirteen other applications. Out of the fourteen applications, two were selected as candidates. The committee was unanimous in its rejection of appellee's application.

The trial court, in arriving at its decision, stated the following:

"The Court is particularly concerned about the following factors in the Art Department Graduate admission procedures:

1. The committee seems to have no agreed standards or even guidelines to follow. Of necessity, each committee member's evaluation of the applicant's work must be subjective to a degree. However, each member of this committee seems to follow his own personal standard, idea or hunch as to whether the applicant should be admitted to the graduate program.

2. One of the reasons given for denial is 'Facilities committed.' The procedure used for arriving at this reason is unfair. The committee considered the applicants by groups, the groups being formed by chance, and the committee admitted applicants as it proceeded with each group. When the committee reached the last group of fourteen applicants, one of which was the plaintiff, evidently it facilities were almost entirely committed. It admitted only two of the fourteen applicants of the last group, whereas it admitted one out of four in the groups, overall. The fair way to have proceeded would be to defer the decisions until all applicants had been considered, then fill all available openings.

3. The only other reason given for denial was, 'work seems already to be on professional level, but the committee feels that it does not appear to be particularly harmonious with the esthetic attitude within the Art Department.' The Court does not feel that this is sufficient reason for denial to the graduate college. The Court therefore finds that the Art

Department's graduate admission procedures, both generally and as applied to the plaintiff, are unreasonable, arbitrary, capricious and discriminatory."

The members of the art committee which screened appellee's application testified that their main consideration was the creative efforts of appellee as evidenced by the sample of her work.

The main dispute in this case revolves around the statement made by the committee that "Work seems already to be on professional level, but the committee feels that it does not appear to be particularly harmonious with the esthetic attitudes within the art department." Appellee would have one believe that her rejection by the faculty committee was not unlike the rejection by the Salon of French Academie Royale of Manet's "Le Dejeuner sur L'Herbe." In other words, according to appellee's theory below, it was because she was different that she was rejected. Whereas Manet's painting was rejected because of his new revolutionary technique, Mrs. Wilson's problems seem to be the opposite. The testimony of Professor Wayne Enstice, a member of the faculty committee, is paraphrased as follows: Some amount of technical achievement was present but it was not used in any genuine original way in terms of form, composition or statement. Her paintings are cliches, formula written, of a pedestrian sort that one would find in a tourist situation. Her work was stagnant. Many of the same techniques and subject matter of appellee's painting can be seen in department stores and tourist establishments. The use of the words "professional level" as applied to Rubye Wilson meant that she had her paintings in various exhibitions and had done greeting cards, however, there are degrees of professional artists and Rubye Wilson's paintings are of the tourist establishment variety. Her paintings were "saccharin," and lacked any kind of formal invention or originality. The other members of the committee who remembered her work, testified to having had substantially the same impressions of it as did Professor Enstice.

Two of Mrs. Wilson's teachers testified. Mrs. Wilson took undergraduate work from Professor Dennison and also enrolled, while an undergraduate, in a graduate course in studio painting from which she later withdrew. Professor Dennison considered her unteachable by him. He stated that while she was in the graduate course most of his criticism ended up in an emotional dead-end. She wept and would leave class early in frustration. He did not consider her a potentially successful candidate for a Master of Fine Arts degree. His views were conveyed to the faculty committee.

Professor Scott, who is a member of the faculty committee and also taught her in an undergraduate course, considered her incapable of graduate work. He also stated that she could not take criticism nor would she cure any faults. He considered her unteachable.

Professor Croft, a member of the faculty committee, stated that when he viewed the work of the applicants, he looked for future promise. He tried to determine whether the candidate would succeed in the program. He stated that the kind of imagery that Mrs. Wilson was pursuing was pretty much a dead-end street. As far as he was concerned, there wasn't much anyone could do to work with her or help her improve something that is so commonplace that it seeks no further expression or seeks no further end.

Appellee presented no testimony by art instructors, art critics or art experts concerning her work. It was appellee's position below that since she had won awards in art exhibits, sold some of her work, and received good grades in undergraduate school, this was enough to require her admittance as a candidate for a Master of Fine Arts degree. As explained by members of the Art Department, there is not necessarily any correlation between undergraduate grades and the ability to complete

the requirements for a Master of Fine Arts degree. Nor were the members of the faculty committee impressed with the fact that she had won prizes in art exhibits or sold her work. All members of the faculty committee stated that they based their decision on the slides that were presented to them which is a proper basis for their decision.

This case represents a prime example of when a court should not interfere in the academic program of a university. It was incumbent upon appellee to show that her rejection was in bad faith, or arbitrary, capricious or unreasonable. The court may not substitute its own opinion as to the merits of appellee's work for that of the members of the faculty committee who were selected to make a determination as to the quality of her work. *Edde v. Columbia University in the City of New York,* 8 Misc.2d 795, 168 N.Y.S.2d 643 (1957), cert. den. 359 U.S. 956, 79 S.Ct. 744, 3 L.Ed.2d 763 (1957).

Although lawyers and the military may be fascinated by check lists, we do not believe that the lack of a check list or list of objective standards to be used by the members of the faculty committee renders their decision arbitrary, capricious or unreasonable. As was stated by Professor Littler, the chairman of the faculty committee who has been involved with check lists in the past and found them of no help:

> "To write them [standards] down as a list would be a distortion of our use of them, and also it would be a straight jacket for the action or any action had by the committee."

He stated that the standards would not clarify the committee's thinking since, "In a certain way the action of the committee is creative, a creative act. We go into the process of bringing as much of our own background and energy and understanding and perception as we possibly can. I think the other would be a poor substitute."

Indeed, the adoption of a set of "objective standards," even assuming that an art committee could agree as to what those standards would be, might lead to the rejection of a budding Monet or Kadinsky. Art cannot be created by any set of rules. In fact, one need only look at the works of Picasso to see that it is often the departure from the so-called rules that has created great art.

The method used by the university to select candidates, that is, the screening of applications as submitted and not in one large group, is not relevant in this case since it is clear that Mrs. Wilson would not have been selected as a candidate no matter when her application was processed. In any event, we find the method used by the appellants to have been rational and valid.

The judgment of the trial court is reversed and the trial court is ordered to enter judgment in favor of appellants and against appellee.

KRUCKER and HATHAWAY, JJ., concur.